NOT DESIGNATED FOR PUBLICATION

Nos. 119,088
119,089

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of B.A.D. and B.A.D.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS, judge. Opinion filed October 5, 2018. Affirmed.

*Matthew L. Tillma*, of Law Office of Gregory C. Robinson, of Lansing, for appellant natural father.

*Gerald R. Kuckelman*, of Atchison, for appellees maternal grandparents.

Before HILL, P.J., PIERRON and POWELL, JJ.

PER CURIAM: W.B.D., Jr. (Father) appeals the termination of his parental rights by the district court to his two children. Specifically, Father argues that there was insufficient evidence to support the district court's unfitness finding and that the district court erred by finding that termination was in the best interests of the children. After a review of the record, we affirm.

FACTUAL AND PROCEDURAL HISTORY

The children, a boy born in 2009 and a girl born in 2010, both have the initials B.A.D. For ease of reference, we refer to the boy as B.A.D. and the girl as B.D.

1

On May 1, 2015, the maternal grandparents of B.A.D. and B.D. filed a petition in the Leavenworth County District Court alleging that both were children in need of care. At the same time, the maternal grandparents applied ex parte for protective custody of B.A.D. and B.D., which the district court granted. The petition alleged that B.A.D. and B.D. had lived with their maternal grandparents for most of their lives.

On June 22, 2015, the district court adjudicated B.A.D. and B.D. as children in need of care. A reintegration plan was established for both parents and adopted by the district court on February 5, 2016. Father contacted CASA and set up supervised visitation with the children to occur once a week beginning June 22, 2015.

Father's reintegration plan set out the following tasks for Father to complete: (1) obtain an independent suitable and stable residence; (2) maintain stable employment; (3) maintain regular contact with the children and visitation through CASA; (4) provide updated contact information; (5) make monthly child support payments in accordance with court orders; (6) demonstrate appropriate parenting skills and not expose the children to undesirable individuals; (7) sign any necessary releases; (8) obtain an alcohol and drug evaluation and follow all recommendations of that evaluation; (9) remain free of any illegal drugs and provide urinalysis samples as ordered by the court; (10) regularly attend any scheduled medical and vision appointments of the children; and (11) successfully complete parenting classes.

On March 31, 2016, due to violating the terms and conditions of his probation in a criminal case, Father began serving a 24-month prison sentence. At the time, he had been making progress on his reintegration plan but had not completed it. The district court suspended Father's visitation on April 6, 2016, due to his incarceration.

On October 12, 2017, the maternal grandparents filed a motion asking for findings of unfitness of both parents and termination of parental rights. The district court held a

hearing on the motion on November 15, 2017. At the beginning of the hearing, Mother consented to the appointment of the maternal grandparents as permanent custodians of the children. Father contested the allegations in the motion to terminate, and the hearing continued. The children's maternal grandmother, Mother, a DCF worker, Father, and Father's sister testified. At the time of the hearing B.A.D. was eight years old and B.D. was seven years old.

The maternal grandmother testified that at the time of the hearing the children had lived with them permanently for a little over three years. Since the children had come to live with them, Father had not really been involved in their lives and had rarely exercised his CASA visits and other visitation. During his incarceration, Father did not make phone contact with the children at their grandparents' house; however, once in a while during Mother's visitation, Father would make phone contact with the children.

During the first three or four months of the grandparents' protective custody of the children they received partial child support payments from Father, but upon his unemployment and subsequent incarceration they received no child support payments from him.

The maternal grandmother also testified that B.A.D. and B.D. each received a birthday card from Father in 2017 and the children received a Christmas gift from Father in 2016; however, these gifts were disparate in value with B.A.D. receiving a much nicer gift than B.D. Grandmother testified that because of their ages, B.A.D. and B.D. did not notice the difference in treatment. According to Grandmother, the only time the children talked about Father was after visitation with him prior to his incarceration or after visitation with their paternal grandfather after Father's incarceration. Grandmother testified B.A.D. and B.D. knew who their father was but had no real relationship because he had been out of their lives so much.

3

Mother testified that she and Father were not married; they separated when B.A.D. was approximately three and B.D. was approximately two. After the separation Father did not maintain consistent contact with the children. During the time between the end of their relationship and the maternal grandparents receiving protective custody of the children, Father would occasionally keep the children overnight, but it was never consistent. Also during that time he was in and out of jail multiple times.

During Mother and Father's relationship there were a lot of acts of violence inflicted by Father against Mother. These acts of violence involved aggressions like pushing Mother, pulling her hair, and putting a pillow over her face. Mother testified that a couple of these acts occurred in front of the children and led B.A.D. to have "really bad anger outbursts like his father." There was also an instance where Mother alleged that Father chased Mother's vehicle and attempted to run her off the road while B.A.D. and B.D. were in the car. These acts, both during and after their relationship, also resulted in multiple protective orders being granted against Father and the entering of restraining orders against Father from contacting Mother and the children. These orders were violated multiple times. Mother also testified that Father had threatened to kill or harm himself several times—he threatened to jump off a bridge, sent Mother pictures of slit wrists, and attempted to light himself on fire. Father's former girlfriend also threatened to kill the children, and Father remained in that relationship even after this threat. Mother testified that she was fearful of Father having unsupervised time with the children because in the past he had made threats that if he was alone with the children Mother would never see them again or he would make her fight to get the children back.

Mother testified that the children do not say much to her about Father but that B.A.D. seemed more interested in discussing Father. Mother also believed that Father had drug and alcohol issues.

During some of Mother's visitation time with the children she would allow them to have phone contact with Father. These calls would occur about every other week; however, at the time of the hearing there had not been a call since the summer because Mother chose to block the prison number as Father kept contacting her outside of the children's visitation and sending her threatening messages. In the first year of Father's incarceration, Mother knew of a maximum of three letters he had written to the children. Mother testified that Father had sent the children a Christmas present in 2016 but that she had never received anything to give them for their birthdays. She did state that someone else may have received something on the children's birthdays to give them, but she was unaware if this had occurred. Mother testified that she believed Father's relationships with his son and daughter were different. B.A.D. seemed to want his father around, but B.D. did not really know him.

Child support from Father to Mother ceased when he became unemployed; according to Mother, he owed nearly $10,000 in back child support. She stated the only other type of assistance she received from Father since their separation was approximately $70 worth of clothes about four years prior to the hearing.

During the children's lives, Mother and Father's relationship was on and off; when they would break up or when Father would be incarcerated, Mother would move back in with her parents. Mother also was incarcerated for 60 days immediately prior to the filing of the CINC petition, and she left the children with her parents.

Lisa Gresham, a DCF worker, testified she had been involved with the case since November 2016. Gresham was aware of only one letter Father gave to her to give to the children and some phone contact during CASA visits in the past year. Father only contacted Gresham one time—the sending of the letter for her to give to the children—during her involvement of the case. Additionally, Gresham testified that it was impossible

for Father to work on his reintegration plan while incarcerated. She stated that the children have only brought up Mother in conversation, never Father.

Father testified on his own behalf. He agreed that he and Mother had an on and off relationship. When asked if he had any contact with his children in the last three years, Father testified that "right before [his] incarceration [he] was doing CASA visits." Father was incarcerated on March 31, 2016, for aggravated battery and making a false police report; he was originally sentenced to probation for these crimes, but it was revoked when he violated the terms of that probation by committing the felony of trafficking in contraband for bringing a cell phone into jail while serving a 60-day probation violation sanction. Father admitted that prior to his incarceration he had an alcohol problem but that he participated in a substance abuse program while in prison. While incarcerated Father also completed a parenting program, received his GED, completed vocational classes, and completed plumbing training classes. Although Grandmother and Mother testified that they had not received child support from Father, he submitted a statement showing that half of his state pay while incarcerated was being garnished for child support payments, but he also had another child he was supporting with these withholdings. Father acknowledged that he did not send letters to his children via DCF because he gave letters to his father—B.A.D. and B.D.'s paternal grandfather—to pass on to the children during his father's visitation. Father claimed he wrote a letter every other week for his father to give to his children.

Father testified that he was looking into Oxford Housing for housing after his incarceration and that he had been in communication with possible employers but could not apply until he was released from prison because he would be unavailable to interview.

Father agreed that he owed approximately $10,000 in back child support for B.A.D. and B.D. Father also admitted that he and Mother had violent altercations and that

he had been violent with other people in the past, as evidenced by his multiple aggravated battery convictions. He also acknowledged that there were a lot of protective orders against him and that he had violated some of those orders. Father stated that he had been incarcerated approximately five years of his life since 2005. Father testified that he could not complete all of the reintegration plan because he was incarcerated and agreed that it was his own fault he was in prison. Father had two write-ups while in prison. When asked how the court could be assured that Father would not return to his criminal lifestyle when he was released from prison in four months, Father responded:

> "Because I will do everything I've been promising you guys from the get go of this case. I've taken all these classes. All the classes I have achievements for are the things I'm going to follow-up when I get out of here as in following either working the HVAC plumbing—or HVAC, or going into the plumbing if I'm able to get right into the job. But as I stated, you know, all the program I've taken is to better myself for when I'm out."

Finally, Father's sister testified that there was the possibility that Father could live with her after his release from prison.

The district court took the matter under advisement and, on January 26, 2018, issued a written order finding Father unfit and terminating his parental rights. The district court held: (1) there was a presumption of unfitness against Father under K.S.A. 2017 Supp. 38-2271 and that Father failed to rebut the presumption of unfitness; (2) Father was unfit under certain factors in K.S.A. 2017 Supp. 38-2269(b) and (c); (3) Father's condition rendering him unfit was unlikely to change in the foreseeable future; and (4) termination of Father's parental rights was in the best interests of B.A.D. and B.D.

Father timely appeals.

7

On appeal, Father makes two principal arguments. First, he argues that there was not clear and convincing evidence supporting the district court's unfitness finding. As a corollary to this argument, he argues the district court erred in finding that a presumption of unfitness applied. Second, he argues the district court abused its discretion by terminating his parental rights.

At the outset, an introduction of the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq., governing the legal principles regarding the termination of parental rights may be helpful.

> "[A] parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2016 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

> "As provided in K.S.A. 2016 Supp. 38-2269(a), the State must prove the parent to be unfit 'by reason of conduct or condition' making him or her 'unable to care properly for a child' and that the circumstances are 'unlikely to change in the foreseeable future.' The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2016 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2016 Supp. 38-2269(c). In addition, the State may rely on one or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2016 Supp. 38-2271." *In re K.O.*, No. 116,704, 2017 WL 2403304, at *2 (Kan. App. 2017) (unpublished opinion).

Once a child has been adjudicated a CINC, termination of parental rights is governed by K.S.A. 2017 Supp. 38-2269. In order for the district court to terminate parental rights, the State must prove by clear and convincing evidence that (1) the parent

is unfit and (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). The State also must prove, albeit only by a preponderance of the evidence, that termination is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1); see *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

## DID THE DISTRICT COURT ERR IN FINDING A PRESUMPTION OF UNFITNESS?

First, Father argues that the district court erred in finding that a presumption of unfitness applied to him because he would become a fit parent in the near future. The maternal grandparents argue in response that there was not a reasonable probability that Father would carry out the reintegration plan in the near future.

In reviewing a district court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated.]" *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In this instance, because the maternal grandparents are the petitioners, their burden is the same as the State's in a typical CINC case. Clear and convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. Appellate courts do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

According to the applicable sections of K.S.A. 2017 Supp. 38-2271, certain facts create a presumption of unfitness:

> "(a) It is presumed in the manner provided in K.S.A. 60-414, and amendments thereto, that a parent is unfit by reason of conduct or condition which renders the parent

unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:

. . . .

(5) the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; [or]

(6) (A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

The parent may rebut the presumption of unfitness by a preponderance of the evidence. K.S.A. 2017 Supp. 38-2271(b).

On appeal, Father argues in mitigation that his failure to fully complete the reintegration plan was due to his incarceration. He also argues that because of his work in prison to better himself he was likely to complete the reintegration plan in the near future—after his release in four months.

However, only one of the presumptions of unfitness the district court applied is necessary for the district court to have found Father presumptively unfit. Under K.S.A. 2017 Supp. 38-2271(a)(5), the maternal grandparents had to establish by clear and convincing evidence that (1) B.A.D. and B.D. had been in a court-ordered out-of-home placement for a cumulative total period of one year or longer and (2) Father had substantially neglected or willfully refused to carry out a reintegration plan. There is no requirement under K.S.A. 2017 Supp. 38-2271(a)(5) that there be "a substantial

10

probability that the parent will not carry out such plan in the near future" as required under K.S.A. 2017 Supp. 38-2271(a)(6). Although the district court found unfitness under both presumptions, if the facts support the district court's presumption of unfitness finding under K.S.A. 2017 Supp. 38-2271(a)(5), then we need not analyze if the maternal grandparents showed there was a substantial probability that Father would not carry out the reintegration plan in the near future.

Father does not dispute that B.A.D. and B.D. were in a court-ordered out-of-home placement for more than a year. Father also does not argue that he failed to comply with the reintegration plan. Father is correct that incarceration may be a mitigating factor; however, his argument ignores that incarceration may also be considered a significant aggravating factor.

> "[I]ncarceration *may* be considered a mitigating factor, it's up to the district court how to consider a person's incarceration within the facts of the case. *In re M.D.S.*, 16 Kan. App. 2d at 509-11. In some cases, incarceration might be cause to excuse a parent's failure to complete certain tasks toward reuniting with a child. In other cases, incarceration may be considered a significant negative factor, such as where it has impeded the development of a relationship between the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests. 16 Kan. App. 2d at 509-11." *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 771 (2014).

Here, Father's reintegration plan set out the following tasks for him to complete: (1) obtain an independent suitable and stable residence; (2) maintain stable employment; (3) maintain regular contact with the children and visitation through CASA; (4) provide updated contact information; (5) make monthly child support payments in accordance with court orders; (6) demonstrate appropriate parenting skills and not expose the children to undesirable individuals; (7) sign any necessary releases; (8) obtain an alcohol

11

and drug evaluation and follow all recommendations of that evaluation; (9) remain free of any illegal drugs and provide urinalysis samples as ordered by the court; (10) regularly attend any scheduled medical and vision appointments of the children; and (11) successfully complete parenting classes. The only tasks that Father had completed based on the evidence presented at the hearing were to obtain an alcohol and drug evaluation and follow the evaluation's recommendations, remain free of illegal drugs, and successfully complete a parenting class. Father did attempt to make contact with his children while incarcerated via letters, but these letters were not sent through CASA; rather, they were sent to his father who then gave the letters to the children. Prior to this most recent incarceration, Father had been incarcerated for approximately five years of his life since 2005. Because of this, it was questionable if B.D., at seven years old, even knew who her Father was because of his frequent absences from her life due to his inability to remain free from State custody.

It is important to frame Father's most recent incarceration in context. He was originally sentenced to probation in his criminal case—which would have allowed him to make significant progress on his reintegration plan—but he was convicted of trafficking in contraband, which led to the revocation of his probation. This incarceration is one purely of his own making. "Parental unfitness can be judicially predicted from a parent's past history. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982)." *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion). Thus, Father's past conduct may be used as an indicator of his future behavior.

Father has had unquestionable difficulties remaining crime free during his children's lives, and this inability strongly lends itself to the conclusion that Father's most recent incarceration should not be viewed as a mitigating factor but an aggravating one. Therefore, there was clear and convincing evidence that the presumption of unfitness under K.S.A. 2017 Supp. 38-2271(a)(5) was applicable here and that Father failed to rebut this presumption by a preponderance of the evidence.

The district court also made unfitness findings under K.S.A. 2017 Supp. 38-2269(b) and (c). But, because the district court correctly applied a presumption of unfitness in this case, such findings under K.S.A. 2017 Supp. 38-2269 were unnecessary and not required under the statute. This notwithstanding, in the alternative and without itemizing the evidence, our review of the record supports the district court's findings of unfitness under K.S.A. 2017 Supp. 38-2269.

II.     WAS TERMINATION OF FATHER'S PARENTAL RIGHTS IN THE BEST INTERESTS OF THE CHILDREN?

Father also argues the district court erred in finding that termination of his parental rights was in the best interests of the children.

A district court must determine whether termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the child, and its judgment will not be disturbed in the absence of an abuse of judicial discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002); *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010), *rev. denied* October 7, 2010. A judicial action constitutes an abuse of discretion if no reasonable person would take the view adopted by the trial court or the decision is based on an error of law or fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

When considering whether terminating parental rights is in the best interests of a child, "the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In order to find that termination of parental rights is in the best interests of a child, the district court must consider the nature and strength of the relationship between a parent and child and the trauma that termination may cause to the child, and it must weigh these considerations against a

13

further delay in permanency for the child. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Here, the district court considered whether it was reasonable to expect reintegration within a time frame consistent with the children's developmental needs pursuant to K.S.A. 2017 Supp. 38-2255(e)(7) and found that the physical, mental, or emotional needs of the children would be best served by the termination of Father's parental rights. A review of the record indicates that it is clear that Father was not a major part of the children's lives before his imprisonment. He was in and out of jail or prison for large portions of their childhoods, and he did not have a stable place to live so B.A.D. and B.D. resided with their maternal grandparents. His visitation was exercised infrequently and inconsistently, as was his communication with them before his most recent imprisonment. Additionally, Father was approximately $10,000 behind on his child support obligations for B.A.D. and B.D. and did not provide material support to the children in any meaningful way. Further, B.A.D. had violent outbursts, which Mother believed were caused by B.A.D. witnessing Father's violence against her, and B.D. did not appear to have a meaningful connection with her Father. Although Father had made several positive changes to better himself while incarcerated, it cannot be ignored that Father's incarceration was of his own making.

Moreover, even though Father was due to be released from prison four months after the hearing,

> "'a child should not have to endure the inevitable to its great detriment and harm in order to give the [parent] an opportunity to prove [his or] her suitability. . . . The child's present condition and environment is the subject for decision not the expected or anticipated behavior . . . of the [parent]. . . . The law does not require the court to experiment with the child's welfare to see if [the child] will suffer great detriment or harm.'" *In re Price*, 7 Kan. App. 2d at 480 (quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]).

14

The children had been without their father most of their lives and there was no guarantee he would be able to continue his positive changes after his release. Based on this evidence, the district court did not abuse its discretion in finding that, at the time of the hearing, it was in the best interests of B.A.D. and B.D.'s physical, mental, and emotional needs to terminate Father's parental rights.

Affirmed.